1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

| | |
|---|---|
| **SHAWN ALAN GILLICK,**<br><br>Plaintiff,<br><br>**v.**<br><br>**CAROLYN W. COLVIN,**<br>**Acting Commissioner of Social**<br>**Security,**<br><br>Defendant. | CASE NO. 3:12-cv-1810-LAB (PCL)<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE:**<br><br>**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 11); and**<br><br>**GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT (Doc. 14.)** |

**I.**

**INTRODUCTION**

On July 23, 2012, Plaintiff filed this action pursuant to the Social Security Act, 42 U.S.C. § 405(g). (Doc. 1.) Plaintiff seeks judicial review of Acting Commissioner of Social Security's final decision denying Plaintiff's application for disability insurance benefits under Title II of the Act and Supplemental Security Income benefits under Title XVI of the Act. (Doc. 1.) Plaintiff filed a Motion for Summary Judgment (Doc. 11), and Defendant filed a Cross-Motion for Summary Judgment (Doc. 14). The Honorable Larry A. Burns referred the matter to undersigned judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After a thorough review of all pleadings and the entire record

submitted in this matter, this Court recommends that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

## II.

## BACKGROUND

### A.  Procedural Background

Plaintiff Shawn Alan Gillick filed an application for Disability Insurance Benefits and Supplemental Security Income on March 19, 2009, alleging an inability to work beginning July 20, 2002. (A.R. 156-162.) After Plaintiff's application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (A.R. 99-100.) On July 22, 2010, Plaintiff appeared and testified before ALJ Eve B. Godfrey. (A.R. 24-76.) Plaintiff was represented by counsel. (Id.) An impartial medical expert, Alfred G. Jonas, M.D., appeared and testified. Vocational expert Mark Remas also appeared and testified at the hearing. (Id.)  In a decision dated February 25, 2011, the ALJ determined that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Act. (A.R. 10-20.)  In her decision, the ALJ made the following findings:

1.  The claimant has met the insured status requirements of the Social Security Act through December 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since July 20, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Personality disorder with passive aggressive, borderline and narcissistic traits (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can work in a

nonpublic work environment with minimal contact with others.

6. The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 20, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(A.R. 12-20.)

On May 19, 2012, the Appeals Council denied Plaintiff's request for review and adopted the decision of the ALJ as the final decision of the Commissioner. (A.R. 1-3.) Plaintiff filed the instant complaint on July 23, 2012. (Doc. 1.) Defendant answered on September 20, 2012. (Doc. 8.) Plaintiff filed a Motion for Summary Judgment (Doc. 11), and Defendant filed a Cross-Motion for Summary Judgment in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 14).

This Report and Recommendation addresses both motions pending before it.

## III.

## ADMINISTRATIVE RECORD

### A. Medical Evidence

1. Treating Physicians

Plaintiff was honorably discharged from the United States Marine Corps on July 19, 2002. (A.R. 164.) He cites the following day as the onset date for his disability claim. (A.R. 156-162.) On September 26, 2002, Plaintiff presented to the Department of Veterans Affairs as a new patient. (A.R. 433.) Plaintiff continued treatment at the VA and was seen in relation to diagnoses of bipolar disorder as well and addiction to cough syrup. (A.R. 363-357.)

On November 2, 2007, Plaintiff was admitted to the inpatient detox program at the VA. (A. R 560.) Upon admission, his intake records reflect that he wished to address "chronic use of dextromethorphan and intermittent binging on methamphetamines." (A.R. 552.) He remained there for 28 days and was discharged on November 30, 2007. (A.R. 504.) In the discharge notes, the

reporting nurse gave Plaintiff a good prognosis and opined he would "improve if he remains in the recovery home and becomes active in the 12-step program, works with his sponsor, finds a home group and attends Aftercare." (A.R. 506.)

During detox, Plaintiff attended Substance Abuse Treatment Program (SATP) group counseling and Substance Abuse Mental Illness (SAMI) program counseling and received additional clinical counseling in nutrition and recreation. (A.R. 504-571.) The SAMI program addressed Plaintiff's bipolar disorder in concert with substance abuse. (Id.) Progress notes made by clinicians during Plaintiff's stay detailed daily meetings attended, notable interactions with inpatient staff, and updates on Patient's progress through the detox process. (Id.) SATP notes included interactions with peers, uses of day passes to socialize in the San Diego area, goal setting, and general positive progression through the treatment process. (Id.)

Following the detox program, Plaintiff continued his participation in SAMI while living at Way Back, a recovery home. (A.R. 498-500.) Plaintiff failed to attend or reschedule his first four SAMI meetings following his discharge. (Id.) On January 8, 2008, Plaintiff attended a SAMI meeting where he reported continued drug abstinence and that he was attending Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings regularly. (A.R. 494.) Additionally, Plaintiff reported that he was actively applying for jobs and that his goal was to submit four applications per day. (Id.) On February 25, 2008, Plaintiff reported that he left Way Back and moved back in with his surrogate father, Alan Harris. (A.R. 491.) Plaintiff stated he left the recovery home because it was "not [an] environment where I can work on recovery." (Id.) Plaintiff failed to attend the two subsequent SAMI meetings following his departure from Way Back. (Id.)

Plaintiff contacted a VA social worker to indicate that he had relapsed on February 25, 2008. (A.R. 490.) In the next SAMI meeting Plaintiff attended, he reported that he was no longer attending AA or NA meetings. (Id.) Despite relapsing, Plaintiff remained enrolled in SAMI until April 19, 2008, when he was

discharged due to repeated absences. (A.R. 486.) Plaintiff enrolled in Alcohol Drug Treatment Program (ADTP) group counseling on December 1, 2008; however, due to consistent no-shows, he was discharged 23 days later. (A.R. 472.) Plaintiff's medical record lacked entries between late December 2008 and March of 2009, when Plaintiff submitted his application for benefits with the Social Security Administration.

2.    Mental Health Consultation for Social Security Administration

At the request of the Department of Social Security, Dr. Gregory M. Nicholson conducted a comprehensive Psychiatric Evaluation of the Plaintiff and completed a report of his findings on May 4, 2009. (A.R. 329-335.) Dr. Nicholson was not provided with any of Plaintiff's past medical records at the time of his evaluation. (A.R. 329.) In his report, Dr. Nicholson included a diagnostic impression that Plaintiff was suffering from Bipolar Disorder (not otherwise specified) and OCD. (A.R. 333.) Dr. Nicholson reported that Plaintiff's condition was "expected to improve in the next twelve months with active treatment." (A.R. 334.)

Dr. Nicholson indicated Plaintiff is able to "understand, remember, and carry out simple one or two-step job instructions" and that Plaintiff was capable of carrying out "detailed and complex instructions." (A.R. 334.) Dr. Nicholson reported that Plaintiff's ability to relate to and interact with coworkers and the public, associate with day-to-day work activity, and maintain regular attendance in the work place and perform work activities on a consistent basis are all moderately limited. (Id.) Additionally, Dr. Nicholson determined that Plaintiff's ability to maintain concentration and attention, persistence and pace and to perform work activities without special or additional supervision is mildly limited. (Id.) Lastly, Dr. Nicholson reported that Plaintiff's ability to accept instructions from supervisors is not limited. (Id.)

3.    Psychiatric Review Technique and Mental Residual Functional Capacity Assessment

On May 15, 2009, reviewing physician Dr. Kelly Loomis completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (A.R. 338-53.) Dr. Loomis conducted the assessment using medical records from the Department of Veterans Affairs and Seagate Medical Group (comprehensive psychiatric evaluation by Dr. Nicholson). (A.R. 352.)

Dr. Loomis determined that in terms of the categories of Affective Disorders, Anxiety-Related Disorders, and Substance Addiction Disorders, Plaintiff suffered from a medically determinable impairment, but that his impairments did not "precisely satisfy the diagnostic criteria." (AR. 341, 342, 344.) In assessing the B Criteria of the Listings, Dr. Loomis reported that Plaintiff's difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace were moderately limited. (A.R. 346.) However, there was no restriction of activities of daily living or repeated episodes of decompensation, each of extended duration. (Id.)

Dr. Loomis concluded that Plaintiff was "capable of understanding, remembering and carrying out one to two step tasks." (A.R. 352.) Additionally, according to the report, Plaintiff is "able to interact adequately with coworkers and supervisors but may have difficulty dealing with the demands of general public contact." (Id.)

4. Plaintiff's Disability Reports

Plaintiff completed Disability Report – Adult-Form SSA-3368 – as part of his initial application for benefits. (A.R. 217-223.) In the undated report, Plaintiff stated that mental impairment, bipolar disorder, depression, social anxiety, and obsessive compulsive disorder anxiety have limited his ability to work. (A.R. 218.) He stated his work is limited because he "isolate[s] and [does not] want to be in places where there are people," and he sleeps all day. (Id.) Plaintiff added that he suffers from a "major anger control problem" and at one time cut himself. (Id.) Plaintiff stated he stopped working "because of [his] disability," though he did

report working minor jobs after the date he claimed his disability first interfered with his ability to work. (Id.)

Plaintiff reported that he was previously employed as a hotel housekeeper, cook, and logistics worker. (A.R. 219.) Plaintiff stated that his longest held job was as a logistics and warehouse worker in the United States Marine Corps. (Id.) At this job, Plaintiff cleaned barracks, did office and warehouse administrative work, used forklifts, and shot at a rifle range. (Id.) Plaintiff stated that special tools, machines, technical knowledge, and technical skills were required to complete his job. (Id.) In his past work, Plaintiff stated that he walked or stood ten hours per day and sat for four hours. (Id.) He stooped one hour, kneeled one and a half hours, crouched one hour, handled large objects for three hours, reached three and a half hours, and wrote or typed five hours per day. (Id.) Plaintiff stated he lifted or carried boxes of supplies that were regularly 20 pounds but could exceed 100 pounds. (Id.) Additionally, Plaintiff reported that as a lead worker, a portion of his position included supervising ten people, which was roughly forty percent of his day. (A.R. 219-220.)

Plaintiff stated that he was seen by a doctor for his mental conditions. (A.R. 220.)  He provided contact information so that SSA could access records from the Department of Veterans Affairs, San Diego Healthcare System (Id.)  Plaintiff stated he completed two years of college in 2005. (A.R. 222.)

Plaintiff completed Disability Report Appeal – SSA-3441 – on August 17, 2009, after his initial application was denied. (A.R. 228-235.)  There, he reported that he continued to remain isolated, but had no new limitations. (A.R. 230.) Plaintiff also stated that he could not care for his "hygiene, bathing, eating, and other tasks related to daily functioning." (A.R. 228.) Plaintiff stated he becomes irritable which has an effect on his "dealings with other people" and that he is "severely limited in [his] daily activities and routine." (A.R. 229.)  Plaintiff stated he is "incapable of existing as a normal human being" which has rendered him

"bed-ridden." (Id.)

Plaintiff subsequently completed an additional undated appellate Disability Report – Appeal Form SSA-3441. (A.R. 239-245.) There, Plaintiff reported that his condition had worsened and that he was then suffering from "extreme depression, anxiety, irritability, suicide ideation, chaos, and panic attacks," and that he felt "totally and completely out of control." (A.R. 240.)

**B. Administrative Hearing**

1. Plaintiff's Testimony

Before ALJ Eve B. Godfrey, Plaintiff testified regarding his work history, medical conditions, and consequent limitations. (A.R. 24-53.) Plaintiff testified in person and was represented by his attorney, Mr. Roy Cannon. (A.R. 24.) Plaintiff testified that he served in the Marine Corps from 1998 until 2002, and then sporadically designed websites until 2006, but that his anxiety, OCD, and anger problems prevented him from working. (A.R. 43.) Plaintiff testified that he last worked in March of 2006. (A.R. 30.)

Plaintiff testified that he has anxiety, depression, OCD, and a problem with authority. (A.R. 43.) Plaintiff reported that he has agoraphobia and "social anxiety to the point where [he] can't even leave the house." (A.R. 33.) According to Plaintiff, because he suffers from OCD, he has to "check everything a million times" if he were to leave the house. (Id.) Plaintiff testified that he is unable to keep appointments and "can't function because of the anxiety of leaving the house." (Id.) Plaintiff reported that his daily routine consisted of sleeping for days at a time and then using cough syrup. (Id.)

Plaintiff enrolled in a dual diagnosis program through the VA called SAMI (Substance Abuse and Mental Illness), where he obtained treatment prior to a relapse. (A.R. 34-5.) After the relapse, Plaintiff testified that he was kicked out of SAMI. He reported "feeling that I didn't have a problem with it" and did not think that he should have to go. (A.R. 35.) Plaintiff reported he was hospitalized in

December of 2007 and successfully detoxed for thirty days. (Id.) That thirty day period was "the only time that [he] has been clean of the dextromethorphan." (Id.) Plaintiff testified that he has been unable to remain drug-free for a period that long since December/January 2007. (Id.)

Plaintiff testified that he began ADTP "around September or November" of 2009 and at the time of the ALJ hearing he had been attending "religiously." (A.R. 36.) Plaintiff testified that although he has been attending ADTP consistently, he still used cough syrup. (Id.) Plaintiff testified that the role of the ADTP meetings was simply to "gain information about addiction." (A.R. 37.) Plaintiff reported that he believed that he was getting help "in some way" by attending the meetings, even though he was continuing to use the drug. (Id.)

Plaintiff testified that he experiences anxiety when he goes to the VA, though he stated that he has not taken medication for anxiety at any time. (A.R. 46.) Plaintiff reported "I feel like they're not listening to me and they're not there for me. I just don't trust 'em." (A.R. 41.) He testified to being unsatisfied with the VA's lack of individual counseling programs as well as the insufficiency of the group counseling. (A.R. 41.) He reported that going to the VA was a big hassle for him. (Id.) Plaintiff stated that he struggles to find transportation from his home in Hillcrest, California to the VA, which is located in La Jolla, California. (A.R. 42.) Plaintiff testified that without an income he does not have money to afford bus fare. (Id.)

Plaintiff testified that prior to his service as a Marine, he was employed in two service industry jobs. (A.R. 67.) Plaintiff stated that he worked as a hotel housekeeper at a Best Western from 1995 to 1997. (Id.) While the dates are not provided, Plaintiff also testified that he worked at McDonalds as a fast food worker. (A.R. 68.)

Plaintiff enlisted in the Marine Corps in 1998. (A.R. 34.) In 1999, Plaintiff was deployed overseas for two months and then spent one year deployed in Okinawa,

Japan in 2000. (Id.) While Plaintiff had stopped his substance abuse at the start of his military career, it was in Okinawa that Plaintiff resumed abusing cough syrup moderately. (Id.)

As a Marine, Plaintiff served as a Logistics Coordinator. (A.R. 47.) Plaintiff likened his role in the Logistics Warehouse to a position as a package carrier for UPS. (A.R. 68.) Plaintiff testified that he had additional administrative duties that included coordinating movement of personnel, movement of large vehicles, and logistical support for deployment overseas. (Id.) He was discharged honorably at the end of his service obligation and testified that he did not want to continue serving in the military as a gay man under the "Don't Ask, Don't Tell" policy. (A.R. 47.) Plaintiff testified that he had "irritability issues and anxiety issues even back when [he] was in the military." (A.R. 48.) When asked to explain how he was able to successfully serve as a Marine despite his stated issues with authority figures, Plaintiff testified that service was his only way to afford college and that it was "a very good experience." (A.R. 49.)

Plaintiff testified that after leaving the military he used the G.I. Bill to fund college. (A.R. 48.) Plaintiff attended for two years and earned a 4.0 GPA. (A.R. 50.) Plaintiff reported his success in college was because he "didn't feel like the people at college were like the people in the military." (Id.) Plaintiff said he saw his professors as authority figures but that it was different because he was "achieving things." (Id.) Plaintiff testified his goal was to eventually be a professor and that he enjoyed school, learning, academia, and "that kind of life." (A.R. 51.)

Plaintiff testified that he stopped going to school because his funding through the G.I. Bill ran out and that he had not planned ahead by working part time for supplemental income. (A.R. 51.) Plaintiff further testified that he was unable to get a job due to the economy. Plaintiff stated that he had submitted applications for administrative assistant and website design positions in January of 2008, but he believed he was not hired due to weight-based discrimination. (A.R. 51-52.)

In March 2006, Plaintiff worked a web design job for roughly a week. (A.R. 30.) The position ended because Plaintiff had a "heated-confrontation with the owner." (Id.) Plaintiff testified that his supervisor would say "...this isn't rocket science" and ask "Do you not know how to do this?" (A.R. 31.) After storming into an associate's office and threatening to quit, the company decided to let Plaintiff go and paid him for the remainder of the week. (Id.)

Plaintiff testified that he briefly had his own business doing website design but that it "was not substantive enough to be considered an income." (A.R. 32.) Plaintiff said that the jobs he had were very limited and he was paid "a couple hundred dollars here, a couple hundred dollars there." (Id.) Plaintiff testified that the jobs were hard to find and that when he worked, he was "a perfectionist to a fault" as a result of his OCD. (A.R. 52.) Plaintiff stated that the clients who hired him for web design projects were satisfied with his work. (A.R. 53.)

Plaintiff testified that all of his living expenses including clothing, food, and shelter were provided for by his surrogate father, Mr. Alan Harris. (A.R. 32.) Plaintiff testified that he met Mr. Harris online in 1996 when Plaintiff threatened to commit suicide. (A.R. 42.) When Plaintiff left the military in 2002, he moved in with Mr. Harris and has continued to live with him since that time. (A.R. 43.) Plaintiff is totally dependent on Mr. Harris for everything and testified that if Harris died tomorrow, he would be homeless on the street or likely dead. (A.R. 46.) Mr. Harris is not working and at the time of the ALJ hearing, Mr. Harris' unemployment benefits had just run out. (A.R. 32.) Plaintiff said that financially, things were currently "pivotal" and "critical." (A.R. 32-33.)

Plaintiff attributed much of his inability to work to a combination of anxiety and anger. He testified that he becomes so anxious prior to work that he becomes nauseated, and cannot eat or concentrate. (A.R. 43.) Plaintiff testified that he is unable to "deal with the pressure of somebody scrutinizing and ... nitpicking everything I do," and that he "[doesn't] do authority very well." (Id.) Additionally,

Plaintiff testified that he would be unable to do a job that consisted of simple repetitive tasks. (A.R. 46.) Plaintiff reported that he had anxiety related to dealing with inanimate objects and mundane employment. Additionally, he argued that he would be unable to complete anything due to complications from his OCD. (Id.)

2. Psychological Expert's Testimony

Psychological Expert Mr. Alfred Jonas, M.D. testified at the hearing on Plaintiff's mental health conditions. (A.R. 54-66.) Dr. Jonas addressed the medical record he was provided and was also afforded an opportunity to interview Plaintiff during the hearing. (A.R. 47-53.) Dr. Jonas testified to the following conditions discussed in Plaintiff's medical record: bipolar disorder, OCD, and substance abuse. (A.R. 54.) In addition, Dr. Jonas proposed that the testimony of Plaintiff was evidence of a personality disorder with "narcissistic and borderline components." (A.R. 55.)

Dr. Jonas, after having reviewed Plaintiff's medical records, testified that there was "absolutely nothing in [the] record that would allow confirmation of 12.04 [bipolar disorder] in any form." (A.R. 55.) Dr Jonas stated that exhibited symptoms were a function of Plaintiff's substance abuse and that there was no support for a bipolar disorder diagnosis. (A.R. 56.) Additionally, Dr. Jonas testified that Plaintiff's description of his behaviors provided no outward manifestations with implications as to Plaintiff's ability to function. (A.R. 56-57.) According to Dr. Jonas, Plaintiff's complaint of "OCD" is "simply a passive aggressive expression of a personality problem." (A.R. 57) As a result, Dr. Jonas testified that neither bipolar disorder or OCD would be able to satisfy the A-Criteria. (A.R. 56-7.)

In discussing Plaintiff's substance abuse, Dr. Jonas testified that the resulting complications easily satisfied A-Criteria requirements. (A.R. 57.) Citing VA medical records regarding Plaintiff's hospitalization, Dr. Jonas testified that there were no observable manic behaviors associated with bipolar disorder in Plaintiff "apart from the substance abuse." (Id.) Quoting direct passages from Plaintiff's

medical record, Dr. Jonas testified that Plaintiff's substance abuse "is not only active but consequential in terms of functioning." (A.R. 59.)

Finding the A Criteria met through substance abuse (12.09) and a personality disorder (12.08), Dr. Jonas then "attempted to analyze the B Criteria in terms of activities of daily living (ADL)." (A.R. 59.) Dr. Jonas reported that the comprehensive evaluation conducted by Dr. Nicholson in May of 2009 shows ADLs as "fully intact." (A.R. 329.) Dr. Jonas stated that there was no evidence in the record that would support a finding of impairment in ADLs despite Plaintiff's complaints of "considerable impairment in his personal testimony." (Id.) Dr. Jonas testified that "on the basis of the record, it is not clear that there's any actual impairment in ability to perform activities of daily living." (Id.)

Dr. Jonas testified that maintenance of appropriate social functioning, as viewed with respect to 12.08, was markedly impaired. (A.R. 60.) Dr. Jonas further reported that there was only a "possibility of a mild impairment" with regard to concentration, persistence, and pace. (Id.) Deterioration of functional settings was challenging for Dr. Jonas to report on, because Dr. Jonas reported that Plaintiff has taken "discretionary opportunities" and "has chosen not to function in settings where he can essentially afford not to function because he has Mr. Harris to do the functioning for him." (Id.) Dr. Jonas offered that Plaintiff's experience in the Marines, two years of college, and the odd jobs after the Marines are evidence of successful functioning at Plaintiff's discretion. (A.R. 60-61.)

Testifying that Plaintiff would have a "meaningful personality problem" regardless of his substance abuse, Dr. Jonas still regarded Plaintiff's substance abuse as "somewhat material" in that it makes Plaintiff "less stable." (A.R. 61.) Dr. Jonas reported that Plaintiff would have a "capacity for pretty good or very good functioning that he has actualized in other settings like the military, college, and a few little jobs" if he were to stop using cough syrup and remain drug-free. (A.R. 62.)

In discussing Plaintiff's ability to work, Dr. Jonas testified that Plaintiff could work an unskilled job. Dr. Jonas contended that Plaintiff would "have problems with people, but especially authority figures" while also noting that "there are times that he's willing to set all of that aside and simply do a reasonable job or a credible job or even a good job." (Id.) Dr. Jonas reported that there is evidence of Plaintiff in situations with authority figures where he has been successful including the military, school, and the highly authoritarian environment of an inpatient rehabilitation program. (A.R. 65.) Dr. Jonas testified that Plaintiff was "capable of applying himself when he wants to and when the substance issue doesn't intervene, and [that] he can be successful." (Id.)

When asked to discuss Plaintiff's psychiatric evaluations, reported impairments and level of functioning in terms of equaling a listed impairment, Dr. Jonas testified that he believed that "a lot of this low level function or abdication of function is essentially discretionary" and that "12.08 [personality disorder] and 12.09 [substance abuse] ... don't matter in terms of whether we should look at [a listing]." (A.R. 66.) Dr. Jonas maintained that Plaintiff is "acting on a choice." (A.R. 66) Only when asked by Plaintiff's attorney to remove the option of "choice" from his evaluation did Dr. Jonas testify that Plaintiff would meet a listing "by definition." (Id.)

    3.    Vocational Expert's Testimony

Vocational expert Mr. Mark Remas testified at the hearing on the issue of Plaintiff's previous employment and capacity to work. (A.R. 68-74.) Mr. Remas testified that Plaintiff's work in the Marines as a shipping and receiving clerk, which is classified as skilled work, medium work, and Specific Vocational Preparation (SVP) level 5, would be considered. (A.R. 69.) Also considered was Plaintiff's previous work as both a hotel housekeeper and fast food worker, which were classified as unskilled, light work at SVP-2. (Id.)

In response to the hypothetical created from Dr. Nicholson's psychiatric

evaluation, Mr. Remas testified that an individual described in that functional assessment would be able to work as a cleaner or housekeeper. (A.R. 69.) Further, Mr. Remas testified that within certain settings, work as a shipping/receiving clerk would also be appropriate. (Id.) Looking at a hypothetical created from Dr. Loomis' Mental Residual Functional Capacity Assessment, Mr. Remas noted that "all past relevant work would be appropriate." (A.R. 70.) The ALJ created a third hypothetical as "non-public, minimal contact with others, and no skill assessment or limitation at this point" to which Mr. Remas testified that work as a cleaner/housekeeper would be appropriate. (A.R. 70-71.) When the no skill assessment was modified to semi-skilled, Mr. Remas testified that work as a warehouse worker would be appropriate. (A.R. 71.)

Mr. Remas testified that Plaintiff can work as a warehouse worker, laundry laborer, bottling-line attendant, or cable worker. (A.R. 71-72.) The jobs Mr. Remas described all required minimal contact with others. Mr. Remas testified that each of these jobs are medium to sedentary, unskilled jobs, that are rated SVP-1 or 2. (Id.) Mr. Remas stated that there are a variety of such jobs available in significant numbers in the national economy. (Id. at 72-73.)

4.  Additional ALJ Comments in the Record

Following all testimony, upon request of Plaintiff's attorney, the ALJ agreed to hold the record open for an additional thirty days so that Plaintiff could be evaluated by a psychologist in light of Dr. Jonas' testimony regarding the 12.08 Criteria. The evaluation was never submitted to the ALJ and was not added to the record until seven months after the hearing and one month after the ALJ's decision. (A.R. 668.)

**C.  ALJ Decision**

The ALJ sought to determine whether Plaintiff was disabled under section 216(i), 223(d), and 1614(a)(3)(A) of the Act. (A.R. 10.) After determining that Plaintiff met the insured status requirements of the Act through December 31,

2007, the ALJ ruled that Plaintiff was not disabled as defined by the Act from July 20, 2002 through February 25, 2011, the date of the ALJ's decision. (<u>Id.</u>)

The ALJ found that Plaintiff has a personality disorder with passive aggressive, borderline and narcissistic traits. (A.R. 12) The ALJ then concluded that Plaintiff's conditions, taken together, did not meet or medically equal any of the criteria set forth in the Listing of Impairments in Appendix 1. (A.R. 14.)

The ALJ determined that the record does not indicate Plaintiff suffers from functional impairments as a result of his mental impairments. (A.R. 14.) In making this finding, the ALJ considered whether the paragraph B criteria were satisfied. The ALJ, through the testimony of Dr. Jonas and the provided psychological evaluations of Doctors Nicholson and Loomis, determined that Plaintiff had marked difficulties only with regard to social functioning. The ALJ determined that Plaintiff had mild restriction and difficulty in activities of daily living and in terms of concentration, persistence, or pace. Further, Plaintiff was determined to have no episodes of decompensation with extended duration. (<u>Id.</u>) Based on these findings, the ALJ concluded that Plaintiff's mental impairment did not meet the criteria for a listed impairment. (<u>Id.</u>)

After concluding that Plaintiff's conditions did not meet or equal a listed impairment, the ALJ evaluated Plaintiff's residual functional capacity. (A.R. 15.) The ALJ determined Plaintiff has the residual functional capacity required to perform a full range of work at all exertional levels. (<u>Id.</u>) The ALJ established a nonexertional limitation by determining that Plaintiff can work in a nonpublic work environment with minimal contact with others. (<u>Id.</u>) The ALJ based her conclusion on medical records, doctors' reports as to Plaintiff's mental impairments, and the ALJ's own determination that Plaintiff's subjective symptom testimony lacked credibility. (A.R. 15-16.)

The ALJ then addressed the opinion evidence from both Dr. Nicholson and Dr. Loomis. (A.R. 17-18.) Both Dr. Nicholson and Dr. Loomis' reports were given

moderate weight as they are "well-supported by the medical evidence, including [Plaintiff's] medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable basis for [Plaintiff's] chronic symptoms and resulting limitations." (A.R. 18.) After reviewing the reports and giving maximum reasonable benefit of the doubt to Plaintiff's subjective claims, the ALJ limited Plaintiff to nonpublic work with limited contact with others. (Id.)

The ALJ adopted the testimony of vocational expert Mark Remas, who addressed Plaintiff's relevant previous work and subsequently concluded that while Plaintiff is unable to engage in his past employment as a Logistics Coordinator , he is capable of performing past relevant work as a housekeeper. (A.R. 18-19.)  In addition, the ALJ found that other jobs exist in the national economy in significant numbers that Plaintiff is capable of performing. (A.R. 19.) The Plaintiff, therefore, was found not to be disabled under the Act from July 20, 2002 through the date of her decision on February 25, 2011. (A.R. 20.)

**D.  Evidence Submitted to Appeals Council**

    1.  Psychological Evaluation by Dr. Milton Lessner

Plaintiff submitted the results of a Psychological Assessment conducted by Dr. Milton Lessner on March 30, 2011. (A.R. 668-79.) Dr. Lessner administered numerous diagnostic tests and inventories and interviewed Plaintiff. (A.R. 674.) Dr. Lessner's report included the results of  Plaintiff's self-assessment, a detailed family history, comments from a discussion between Dr. Lessner and Alan Harris, the diagnostic test findings, and Dr. Lessner's diagnostic impressions. (A.R. 669-679.)

Dr. Lessner only briefly discussed Plaintiff's drug use noting that it was a "pain killing device" and "created a false sense of security." (A.R. 668.) Dr. Lessner noted that Plaintiff had decided two weeks prior that he would abstain from using cough syrup. (Id.) Dr. Lessner noted that Plaintiff identified his drug addiction on the Mooney Problem Check List. (A.R. 676.) Despite this mention,

the report did not contain information regarding Plaintiff's history of drug use, and Dr. Lessner does not identify substance abuse as a concern in his diagnostic impression. (A.R. 678.)

In addressing Plaintiff's test results, Dr. Lessner reported that at the time of the evaluation, Plaintiff was experiencing depression, anxiety, various psychotic symptoms, anger, and suicide ideation. (A.R. 674-5, 677-8.) Based on the results of the tests and his discussion with both Plaintiff and Mr. Harris, Dr. Lessner's diagnostic impression included the following: major depression with psychotic features, attention deficit hyperactive disorder, post traumatic stress disorder, and borderline personality disorder. (A.R. 678.)

Dr. Lessner's report is silent as to whether Plaintiff's impairments preclude him from work. Further, it does not include information regarding the A and B Criteria and if Plaintiff meets any of the required criteria to be found disabled under Title II or Title XVI of the Act.

2. <u>Statements by Alan Harris and Jeremy Tiefenbrun</u>

Alan Harris, Plaintiff's surrogate father and live-in roommate, submitted a written statement on April 21, 2011. (A.R. 260, 262.) This two-page statement contained a brief description of their relationship and a list of incidents that highlight Plaintiff's behavioral concerns. (<u>Id.</u>) These examples include instances of road rage, confrontations with strangers, and threats of self harm. (<u>Id.</u>) Mr. Harris contended that Plaintiff "has been disabled by a host of psychological impairments that are highlighted by violent outbursts... [that] caused or almost caused fights and always create uncomfortable and scary scenes for everyone present." (A.R. 260.)

Jeremy Tiefenbrun has been Plaintiff's friend for over five years. (A.R. 263.) His statement, submitted April 7, 2011, presented examples of Plaintiff's behavior that Mr. Tiefenbrun believes gives credence to Plaintiff's claims of impairment. (<u>Id.</u>) The statement contained examples of Plaintiff's alleged OCD, suicidal tendencies, and drastic changes in mood. (<u>Id.</u>) Mr. Tiefenbrun reported that

Plaintiff "can become belligerent, angry, and even violent" and described an instance where Plaintiff "spontaneously shoved a difficult person into a taxicab." (Id.)

## IV.

## STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A), (2)(A) (West 2004). An applicant must meet both requirements to be "disabled." Id.

A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work she has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

B.  Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.  Id. (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). This matter may also be remanded to the Social Security Administration for further proceedings.  Id. Furthermore, "[a] decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

**V.**

**DISCUSSION**

A. The ALJ provided clear and convincing reasons for her adverse credibility determination.

Plaintiff contends that the ALJ's adverse credibility determination is in error as it is not supported by substantial evidence. (Doc. 11-1, at 11.) Plaintiff contends that the ALJ's credibility findings ignore Plaintiff's regular treatment at the VA hospital and statements provided to the Appeals Council from friends Alan Harris and Jeremy Tiefenbrun which corroborate his own reports of his symptoms and limitations. (Doc. 11-1, at 11-12.)

It is the responsibility of the ALJ to make findings of fact as to a claimant's credibility. See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *2 (July 2, 1996). In evaluating the credibility of a claimant's testimony regarding subjective pain and limitation symptoms, the "ALJ must engage in a two-step analysis." Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). At step one, "'the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)). The claimant need not show that his impairment "'could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, if the claimant satisfies the first test, and there is no evidence of malingering, at step two, the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering "specific, clear and convincing reasons" for doing so. Id. The ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine whether and how these symptoms limit a claimant's ability to work. See 20 C.F.R. § 404.1529(c)(1). In his analysis, the ALJ may consider objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.

Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991). Moreover, evidence provided by non-medical sources such as third parties may be used to evaluate the severity of impairments and the impact it has on daily life. C.F.R. § 404.1513(d)(4). These non-medical sources include "spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy." Id. The ALJ may discount the testimony of the lay witnesses; [however], he must give reasons that are germane to each witness." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). Lay witness testimony that conflicts with medical evidence may be rejected. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ's decision to discredit Plaintiff's testimony must be clearly articulated and based on clear and convincing reasons. Carmickle v. Comm'r of Soc. Sec., 533 F.3d 1155, 1160-61 (9th Cir. 2008). Credibility determinations are findings of fact that must be determined by the ALJ. Where the "record would support more than one rational interpretation, we defer to the ALJ's decision." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citation omitted).

Here, the ALJ discredited Plaintiff's testimony because "the weight of the objective evidence does not support [Plaintiff's] claims of disabling limitations to the degree alleged." (A.R. 16.) In support of her credibility determination, the ALJ pointed out that "none of [Plaintiff's] physicians [have] opined that he is totally and permanently disabled from any kind of work." (A.R. 16.) The ALJ indicated that Plaintiff's claim that he cannot work because of his anxiety is directly contrary to the medical evidence that shows that Plaintiff has not been diagnosed with an anxiety disorder and that "Dr. Jonas did not identify it as a condition [he has]." (Id.) Additionally, the ALJ referred to Plaintiff's testimony that he had never taken medication for anxiety to discredit the contention that his anxiety precluded him from working. (Id.)

Next, the ALJ determined that Plaintiff's "testimony that he cannot work because he has difficulty with people is not credible." (A.R. 16.) The ALJ pointed

to four pieces of evidence in the Administrative Record that belie Plaintiff's testimony: 1) Plaintiff's four years of service in the Marines and subsequent honorable discharge; 2) Plaintiff's academic success for the two years he was in college; 3) Plaintiff's attempt at establishing his own web design business which failed due to the national economy and "not his inability to get along with others;" and 4) portions of Plaintiff's medical record that show Plaintiff has "many friends and enjoys people." (Id.)

Moreover, the ALJ pointed to the behavior that suggests Plaintiff's impairments may not be as serious as he claims. (A.R. 16.) Specifically, this included Plaintiff's repeated canceling of and/or failure to show up to appointments at the VA. The ALJ also pointed to Plaintiff's discharge from the SAMI (Substance Abuse Mental Illness) group for repeated failure to attend sessions. (A.R. 17.) Citing Plaintiff's statement in the record that he "did not want to attend the group because it met too early in the morning (11:00 a.m.) and he liked to stay up late and sleep in the next day," the ALJ decided that the "record suggests that [Plaintiff] is not motivated toward recovery." (Id.)

Furthermore, the statements by third party witnesses in support of Plaintiff's claim of having OCD were given little weight by the ALJ as they conflict with all evidence by medical experts and Plaintiff's medical records. (A.R. 18.) None of the doctors reports support Plaintiff's claim that he has OCD or that his idiosyncracies prevent him from interacting with others and working. Additionally, the ALJ determined that Mr. Harris, Plaintiff's roommate, has a "direct pecuniary interest in the outcome of [Plaintiff's] disability claim." (Id.) In his testimony, Plaintiff testified that he and Mr. Harris' living situation was "very pivotal" as Mr. Harris had recently lost his job, Mr. Harris' unemployment benefits had just ended, and the two were at risk of living off of credit cards. (A.R. 32.) In this testimony, Plaintiff essentially identified his application for disability benefits as an alternative to Mr. Harris seeking new employment. The ALJ's determination that

Mr. Harris' testimony should be given little weight was legally supported despite Plaintiff's contention that it was contrary to law. Similarly, the statement provided by friend Jeremy Tiefenbrun, which was submitted two months after the ALJ's decision and was considered by the Appeals Council, also contradicted the three medical experts and did not provide a sufficient basis for changing the ALJ's decision.

In sum, by showing that Plaintiff's testimony contradicted the objective medical evidence, by identifying discrepancies between Plaintiff's claims and conduct, and by providing legally sound reasons for discrediting the testimony of lay witnesses, the ALJ articulated clear and convincing reasons for discrediting Plaintiff's testimony and his credibility. Consequently, this Court recommends that the ALJ's decision on this ground be upheld.

B. Dr. Lessner's report or Dr. Jonas' testimony do not establish a listed impairment in Step 3 of the sequential process.

Plaintiff argues that the ALJ's finding that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1...fails to consider the evidence submitted to the Appeals Council and is not supported by substantial evidence." (Doc. 11-1, at 10.) It is Plaintiff's contention that the report of Dr. Lessner submitted to the Appeals Council establishes that Plaintiff's diagnosed personality disorder is a mental impairment that meets or equals a listing at step 3 of the sequential evaluation. (Id.) Plaintiff also contends that Dr. Jonas reported that Plaintiff met a listing "by definition." (Doc. 11-1, at 14-15.)

A personality disorder "exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress." (20 C.F.R. § 404 app. 1.) The level of severity required to establish a listed personality disorder for the purpose of obtaining Social Security disability benefits is determined by a two-part analysis requiring

satisfaction of both A and B Criteria. Id. The criteria for a listed impairment cannot be met by diagnosis alone. (20 C.F.R. §§ 404.1525(d), 416.925(d).) A personality disorder diagnosis without a medical determination that both A and B Criteria are met is insufficient to establish that an individual's mental impairment meets the requirements of a listing. Id.

Here, after reviewing all medical records, reports by psychiatrists, and testimony during the hearing, the ALJ determined that because "[Plaintiff's] mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation,...the 'paragraph B' criteria are not satisfied." (A.R. 14.) The ALJ's determination that Plaintiff's impairments do not meet or equal Listing 12.08 (personality disorder) is supported by substantial evidence. Specifically, the ALJ referred to the opinions of an examining psychiatrist, a reviewing psychiatrist, and a testifying psychiatrist to make her determination. (A.R. 14-18.) These psychiatrists all opined that while Plaintiff suffers on some level from mental impairment as well as an addiction to cough syrup, Plaintiff was not precluded from working and with active treatment would greatly improve.

Notwithstanding these three medical opinions, Plaintiff argued that definitive weight instead should be given to the report of Dr. Milton Lessner, who examined Plaintiff after the ALJ's hearing at Plaintiff's expense. (Doc. 11-1 at 9.) Further, Plaintiff argued that testifying psychiatrist Dr. Jonas reported that Plaintiff "meet[s] the listings by definition." (Doc. 11-1, at 15.)

The findings in Dr. Lessner's report are contradictory to the findings of the three medical experts whose opinions were weighed by the ALJ. Additionally, Dr. Lessner's findings at times contradict the provided medical record and Plaintiff's own reports regarding his limitations. Where the three medical experts provide that Plaintiff's drug use is a significant contributor to his limitations, Dr. Lessner only briefly stated that Plaintiff admitted to abusing drugs. Also, Dr. Lessner's report

stated that Plaintiff suffered from suicide ideation where provided medical records show that Plaintiff himself routinely denied experiencing such ideation. Plaintiff's records, three expert's opinions, and all testimony did not include the same impairments Dr. Lessner diagnosed Plaintiff with including depression with psychotic features and "social, emotional, psychotic health problems." (A.R. 678-79.)

Moreover, the report provided by Dr. Lessner differs from the reports of Drs. Loomis, Jonas, and Nicholson in that Lessner's report fails to discuss Plaintiff's ability to work. His report was silent as to the presence of either the A and B Criteria, and the impacts on Plaintiff's activities of daily living are not discussed. As Plaintiff's capacity to work was not mentioned, Dr. Lessner's report would be of no help to the ALJ or Appeals Council in reaching a determination about whether or not Plaintiff is precluded from working by his impairments. Similarly, Dr. Lessner, in making his diagnosis, did not refer to Plaintiff's prior medical records or the examinations of the three medical experts with whom Plaintiff met. Because Dr. Lessner did not discuss Plaintiff's impairments in terms of its onset, Dr. Lessner's report cannot be used to establish that Plaintiff has impairments that satisfy the requirements for either title II or XVI benefits as the requirements are tied to specific time lines. 42 U.S.C §§ 423(c), 1382( c). For title II benefits, Plaintiff's disability must be shown to exist on or before his date last insured, and for title XVI, the cutoff time moves up to the date of the ALJ's decision. Id. Dr. Lessner's diagnosis contains no indicators as to the onset of Plaintiff's impairments, and his diagnosis contradicts the reports and testimony of the three medical experts. As Dr. Lessner's report did not sway the entirety of the medical evidence in the record, the Appeals Council properly found that it did not provide a "basis for changing the [ALJ's] decision." (A.R. 2.)

With regard to Dr. Jonas, Plaintiff's contention that he reported Plaintiff met a disability listing "by definition" is a misrepresentation of his testimony. Dr. Jonas

testified that it was his medical determination that Plaintiff was "acting on choice" (A.R. 66), and that if Plaintiff were to cease using cough syrup, Plaintiff would have "a capacity for pretty good or very good functioning." (A.R. 62.) Dr. Jonas merely postulated that if he were to assume that Plaintiff had no choice in the matter of his substance abuse, then he would have met the impairment listing by definition. (A.R. 66.) As Dr. Jonas testified that Plaintiff did not meet or equal a listed impairment, and the ALJ reasonably relied on his testimony, this Court recommends that the ALJ's decision on this ground be upheld.

C. The ALJ's determinations at steps four and five of the sequential process are supported by substantial evidence.

Plaintiff argues that because his impairments meet or equal a listing at step three, findings under steps four and five of the sequential process are not required. (Doc. 11-1, at 15.) Plaintiff argues the ALJ's step-four determination that Plaintiff can perform past relevant work as a housekeeper "is both based on flawed vocational testimony and by error of law." Additionally, Plaintiff claims that the ALJ's step-five decision was based on a hypothetical question that "fail[ed] to recognize all of the limitations suffered by Plaintiff." (Doc. 11-1, at 17.)

The step-four determination aims to determine if the claimant, with the residual functional capacity as determined by the ALJ, can resume past relevant work. 20 C.F.R. § 404.1520. An expedited process exists whereby an ALJ can skip step four if sufficient information to make a decision at that step does not exist. 20 C.F.R § 404.1520(h). As a result, if the ALJ finds that a claimant can obtain other work as a result of the claimant's age, education, and the previously made residual functional capacity assessment, the claimant will be found not disabled. Id. With regard to step five, a determination that a claimant can return to work based on a hypothetical containing all limitations the ALJ has found to be credible and is supported by substantial evidence is proper. Bayliss v. Barnhart, 427 F.3d at 1217 (because the "hypothetical that the ALJ posed to the VE contained all of the

limitations that the ALJ found credible and supported by substantial evidence in the record," the ALJ's reliance on testimony the VE gave in response to the hypothetical therefore was proper).

Here, Plaintiff does not argue the merits of the ALJ's step-four decision that Plaintiff is capable of returning to work as a housekeeper; rather, Plaintiff simply asserts that past relevant work must be within fifteen years (20 C.F.R. § 404.1656, 416.965) and that the record lacks a reference as to how long in the past Plaintiff's work as a housekeeper took place. (Doc. 11-1, at 16.) Plaintiff's Work History Report includes an entry where Plaintiff reported working as a "Hotel Housekeeping/Cook" between 1995 and 1998. (A.R. 187.) Further, Plaintiff testified that he worked as a housekeeper until 1997. (A.R. 67.) Assuming liberally that Plaintiff left housekeeping work on January 1, 1997, the amount of time that lapsed between that day and the date of the ALJ's decision denying benefits was just over fourteen years. As a result, Plaintiff's argument that the record lacks work history information is contrary to the information that Plaintiff himself twice provided to the ALJ.

Plaintiff also argues that the step-five decision that jobs exist in the national economy that Plaintiff could perform is not supported by substantial evidence as the decision was based on flawed testimony by the vocational expert. (Doc. 11-1, at 17.) Plaintiff contends that the "the hypothetical question upon which the finding is based fails to recognize all of the limitations suffered by plaintiff." (Id. at 17.) For example, Plaintiff argues that the ALJ erred by not including a limitation that Plaintiff cannot accept instructions from supervisors. (Doc. 11-1, at 16.) However, Plaintiff fails to point to evidence from a doctor who opined that Plaintiff was unable to accept instructions from supervisors. Thus, the Vocational Expert properly determined that an individual with Plaintiff's age, education, and residual functional capacity could assume work as a warehouse worker, laundry laborer, bottling line attendant, or table worker. (A.R. 19.) Because this determination was

based on a proper hypothetical that included all of Plaintiff's limitations that the ALJ found credible and supported with substantial evidence, the ALJ did not err in relying on the expert's response to the hypothetical to make his step-five findings. Consequently, this Court recommends that the ALJ's decision on this ground be upheld.

## VI.

## CONCLUSION

For the reasons set forth above, the Court recommends **DENYING** Plaintiff's Motion for Summary Judgment and **GRANTING** Defendant's Cross-Motion for Summary Judgment.

This Report and Recommendation is submitted to the Honorable Larry A. Burns, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before September 4, 2013. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before September 13, 2013. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATE: August 21, 2013

Peter C. Lewis
U.S. Magistrate Judge
United States District Court